Filed 3/3/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SIRY INVESTMENT, L.P.,<br><br>　　Plaintiff and Appellant,<br><br>　　v.<br><br>SAEED FARKHONDEHPOUR et al.,<br><br>　　Defendants and Appellants. | B277750<br>(Consolidated with B279009<br>and B285904)<br><br>(Los Angeles County<br>Super. Ct. No. BC372362) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Stephanie M. Bowick, Judge; and Edward B. Moreton, Judge. Affirmed as modified.

Wilson, Elser, Moskowitz, Edelman & Dicker, Gregory D. Hagen, and Robert Cooper for Plaintiff and Appellant.

Richard L. Knickerbocker for Defendants and Appellants Saeed Farkhondehpour, individually and as trustee of the 1994 Farkhondehpour Family Trust, and 416 South Wall Street, Inc.

Fisher & Wolfe and David Fisher for Defendant and Appellant Morad Neman, individually and as former trustee of

the Neman Family Irrevocable Trust and the Yedidia Investments Defined Benefit Plan.

Greines Martin Stein & Richland, Robert A. Olson, and Edward L. Xanders for Defendant and Appellant Morad Neman, individually and as former trustee of the Neman Family Irrevocable Trust and the Yedidia Investments Defined Benefit Plan.

\* \* \* \* \* \*

This is the fourth appeal in this longstanding lawsuit, and challenges a $7 million default judgment entered after the trial court issued terminating sanctions.  Among the many issues raised by the parties on appeal, three present significant legal questions:  (1) May a trial court issue terminating sanctions when the discovery a party contumaciously refuses to provide encompasses fewer than all the issues in a case; (2) May a party in default file a motion for new trial raising "[e]rror[s] in law," including the inapplicability of certain remedies under the allegations as pled; and (3) May a trial court award treble damages and attorney fees under Penal Code section 496, subdivision (c), in a case involving the fraudulent diversion of business funds rather than trafficking in stolen goods?

On the first question, we conclude that a trial court is not foreclosed from issuing terminating sanctions just because the underlying discovery encompasses only a subset of the issues in the case.  On the second question, we conclude that a party against whom a default has been entered may file a motion for new trial attacking the default judgment as containing "error[s] in law."  And on the third question, we conclude that Penal Code section 496, subdivision (c) only authorizes an award of treble damages or attorney fees when the underlying conduct involves

2

trafficking in stolen goods; in so doing, we respectfully part ways with *Switzer v. Wood* (2019) 35 Cal.App.5th 116 (*Switzer*), which holds to the contrary.

After considering all of the parties' arguments in these consolidated cross-appeals, we affirm the entry of terminating sanctions but modify the judgment to eliminate the awards of treble damages and attorney fees.

## FACTS AND PROCEDURAL HISTORY

### I.     Facts[1]

In 1998, Moe Siry, Saeed Farkhondehpour (Farkhondehpour), and Morad Neman (Neman) formed a limited partnership to renovate and lease space in a mixed-use building in downtown Los Angeles.  The partnership agreement named one general partner (namely, 416 South Wall Street, Inc. (416 South Wall Street), of which Farkhondehpour was president) and four limited partners (namely, Siry Investment, L.P. (Siry), the 1993 Farkhondehpour Family Trust (of which Farkhondehpour was trustee), the Neman Family Irrevocable Trust (of which Neman was trustee), and the Yedidia Investment Defined Benefit Plan Trust (of which Neman was also trustee)).  The agreement divvied up the partnership's cash distributions as follows:  Siry was to receive 39.60 percent; the Farkhondehpour Family Trust, 29.70 percent; the Neman Family Irrevocable Trust, 19.80 percent; and the Yedidia plan, 9.90 percent.  A separate entity—

---

[1]     As is appropriate on review of a default judgment, we draw these facts from the allegations of the operative fifth amended complaint, as well as documents subject to judicial notice.  (*Los Defensores, Inc. v. Gomez* (2014) 223 Cal.App.4th 377, 392-393 (*Los Defensores*); *Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6 (*Evans*).)

3

namely, Investment Consultants, LLC (Investment Consultants)—was responsible for acting as property manager, for making the required cash distributions, and for managing the renovations.

In 2003, Farkhondehpour, Neman, and 416 South Wall Street created an entity named DTLA, required the building's tenants to pay their rent to DTLA, and through these means started to "improperly divert rental income away from the . . . [limited] partnership and into DTLA." Farkhondehpour and Neman also began to charge personal and other non-partnership expenses to the partnership. The net effect of these actions was to direct Investment Consultants to underpay Siry its cash distributions. What is more, Farkhondehpour and Neman ensured that Siry remained unaware of the underpayments by misrepresenting to Siry the building's rental income and the partnership's expenses, effectively lying to Siry about what its cash distributions should have been.

## II. Procedural Background

### A. *Siry's lawsuit, first trial and reversal*

In June 2007, Siry sued Neman, Farkhondehpour, 416 South Wall Street, and the trusts over which they were trustees (collectively, defendants) for underpaying Siry and improperly diverting the partnership's rental income to their own coffers.[2]

---

[2] Siry also sued the limited partnership, but it was not dismissed as part of the terminating sanctions. The partnership had since been dissolved, and Siry's prosecution of the action presumed that the partnership was effectively dismissed. We presume the same.

This was the second lawsuit arising out of the partnership. In 2003, Farkhondehpour and Neman sued Siry for breach of a

4

The matter proceeded to a jury trial in October 2009. At that time, Siry's operative second amended complaint sought (1) dissolution and winding up of the limited partnership, (2) an accounting, (3) damages for breach of the agreement, and (4) damages for breach of fiduciary duty. The jury found for Siry, awarding actual damages of $242,975 and punitive damages of $1.1 million against Farkhondehpour and $2 million against Neman. The trial court denied a subsequent motion for a new trial, but reduced the punitive damages awards to $728,925 against each Farkhondehpour and Neman.

In December 2012, we reversed the jury's verdict. (*Siry Inv., L.P. v. Farkhondehpour* (Dec. 12, 2012, B223100, B234655) 2012 Cal.App.Unpub.LEXIS 9014 [nonpub opn.].) We did so because the special verdict form submitted to the jury did not require the jury to specify whether Farkhondehpour and Neman were liable to Siry individually *or* as trustees of the various trusts. This defect rendered the verdict "hopelessly ambiguous" and, because "who is liable [was] key," necessitated a remand for a re-trial. (*Id.*, at *2, *4, *6-*7, *11.)

**B.** ***Issuance of terminating sanctions on remand***

On remand, Siry propounded two rounds of discovery on defendants—a first round in October 2013 and a second in January 2014. As discussed in more detail below, defendants did not compliantly respond to the discovery or to the trial court's subsequent orders to respond to that discovery without objection.

different agreement, and Siry cross-claimed for underpayment of cash distributions from the partnership. After an arbitrator rejected Farkhondehpour's and Neman's claims, Siry settled its remaining cross-claims in 2007, with the requirement that Farkhondehpour and Neman provide an accounting (and, if warranted, a redistribution) of the partnership's profits.

In late June 2015, Siry moved for terminating sanctions due to defendants' steadfast refusal to respond to Siry's discovery requests or to obey the court's multiple orders compelling responses. At that time, Siry's operative fifth amended complaint sought (1) compensatory damages for breach of the partnership agreement, breach of an oral contract, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and fraud;[3] (2) punitive damages; (3) treble damages pursuant to Penal Code section 496, subdivision (c); and (4) attorney fees under Penal Code section 496 as well as Code of Civil Procedure section 1029.8[4] (on the ground that defendants were acting as unlicensed contractors and unlicensed broker-dealers). Siry had not sought treble damages or attorney fees prior to the first trial. Mere weeks before filing its motion for terminating sanctions, Siry served defendants with notices that it was seeking $4 million in punitive damages against each of them.

Defendants opposed the motion with a brief and nearly 1,700 pages of exhibits. The court held two hearings and issued a written order striking defendants' answers and entering their default.

## C. *Default prove-up and entry of judgment*

Siry filed over 2,000 pages of documents in anticipation of the hearing at which it would prove up its damages.

After reviewing the documentation, the court in July 2016 issued an order finding that Siry had "met its evidentiary burden

---

[3] Siry later dismissed its breach of contract and aiding and abetting claims.

[4] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

6

as to all claims." The court went on to enter default judgment against defendants awarding Siry (1) actual compensatory damages of $956,487, comprised of $534,118 in actual damages plus $422,369 in pre-judgment interest; (2) treble damages of $2,869,461 pursuant to Penal Code section 496, subdivision (c); (3) punitive damages of $4 million (plus $1 against only 416 South Wall Street); (4) attorney fees totaling $4,010,008.97; and (5) costs of $187,109.13. The total came to $12,023,067.10.

### D. *Reduction of damages upon a new trial motion*

In August 2016, defendants filed a motion for new trial on several grounds. Among other things (and as pertinent to this appeal), defendants argued that the trial court had awarded excessive damages and committed errors in law by (1) awarding treble damages under Penal Code section 496, subdivision (c); (2) miscalculating the treble damages award; (3) awarding a constitutionally excessive amount of punitive damages; (4) allowing Siry to collect *both* treble damages *and* punitive damages, rather than requiring Siry to elect between them; and (5) awarding Siry attorney fees under Penal Code section 496, subdivision (c) and section 1029.8.

After Siry opposed the motion, the trial court in September 2016 partially denied and partially granted the motion. As a threshold matter, the court ruled that defendants had standing to make a new trial motion notwithstanding the entry of default. On the merits, the court ruled that (1) treble damages were properly awarded under Penal Code section 496, subdivision (c), but (2) it had miscalculated the treble damages award (and reduced them to $1,912,974); (3) its award of $4 million in punitive damages was constitutionally excessive (and reduced the damages to $1 million each against Farkhondehpour and

7

Neman); (4) Siry would have to elect between treble damages and punitive damages; and (5) attorney fees were properly awarded under Penal Code section 496, subdivision (c) and section 1029.8.

In early October 2016, Siry filed a notice electing to collect treble damages (rather than punitive damages).

In late October 2016, the court entered an amended judgment against defendants, jointly and severally, awarding Siry (1) actual compensatory damages of $956,487, comprised of $534,118 in actual damages plus $422,369 in pre-judgment interest; (2) treble damages of $1,912,974 pursuant to Penal Code section 496, subdivision (c); (3) attorney fees totaling $4,010,008.97; and (4) costs of $187,109.13. The total came to $7,066,579.10.

### E.    *Appeals*

Defendants filed a timely appeal from the original default judgment, and from the amended judgment.  Siry filed a timely cross-appeal from the amended judgment.[5]

---

[5]    Siry and Neman also filed timely appeals from the trial court's October 2017 order reducing the amended judgment by the amount of costs defendants were awarded for prevailing in the appeal of the jury's verdict.  However, none of the parties contests the merits of the offset in this consolidated appeal.

As Siry conceded at oral argument, it argued for the first time in its cross-reply brief that the offset order to the amended judgment effectively constitutes a second amended judgment and that the failure of Farkhondehpour, the Farkhondehpour Trust, and 416 South Wall Street to file notices of appeal from the offset order precludes them from raising any challenges in these consolidated cross-appeals.  Apart from being waived (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 482, fn. 10 (*Garcia*) [arguments raised for the first time in a reply brief are waived]), this argument lacks merit:  A further notice of appeal is required

8

## DISCUSSION

The issues raised in this appeal and cross-appeal fall into two broad categories—namely, (1) defendants' challenge to the entry of terminating sanctions, and (2) the parties' various challenges to the amount of the default judgment. We will address each separately.

## I.    Terminating Sanctions

Defendants argue that the trial court erred in issuing terminating sanctions.

### A.    *Pertinent facts*

#### 1.    *Siry's discovery requests and the trial court's orders compelling responses to those requests*

Following remand from this court's ruling overturning the 2009 jury verdict, Siry propounded two rounds of discovery relevant to this appeal.

##### a.    October 2013 requests for document production regarding liability

In mid-October 2013, Siry issued each of the defendants requests to produce documents relating to, among other things, (1) their "interest in" the partnership, the property, 416 South Wall Street, DTLA, and Investment Consultants; (2) the "compensation [each defendant] received from" the partnership, 416 South Wall Street, DTLA, and Investment Consultants; (3) the partnership agreements, operating agreements, and

only when an amendment to a judgment "results in a substantial modification of [the] judgment" (*Dakota Payphone, LLC v. Alcaraz* (2011) 192 Cal.App.4th 493, 504 (*Dakota*)); an "amend[ment] to add costs" is not a "substantial modification" (*id.*, at pp. 504-505; *Sanchez v. Strickland* (2011) 200 Cal.App.4th 758, 765); and the offset order merely offset costs. Neither logic nor policy warrants treating an amendment subtracting costs differently from one adding them.

9

dissolution documents for the partnership and 416 South Wall Street; (4) the partnership's operating expenses, profits, losses, income, assets, expenditures and distributions; and (5) any payments and transfers of assets to/from Investment Consultants, DTLA, and 416 South Wall Street. Siry requested documents created between January 1, 2002 and December 31, 2010.

Defendants did not respond to these requests by the production deadline.

The trial court issued four separate orders compelling defendants to respond to these requests and to do so without any objections. First, on Valentine's Day 2014, the court granted Siry's motion to compel and ordered defendants to produce responsive documents by St. Patrick's Day 2014. Second, on April 4, 2014, the trial court confirmed that its first order required the production to be without objections and set a new deadline of April 23, 2014. Third, on July 15, 2014, the court once again ordered defendants to produce documents without objections. And, fourth, on October 9, 2014, the court refused to reconsider its third order and adopted a discovery referee's recommendation that defendants produce responsive documents without objection. The court also imposed monetary sanctions of $10,000 against Farkhondehpour and his counsel (who, at that time, was representing all of the defendants) for their intransigence in not complying with the court's prior orders.[6]

---

[6] We affirmed that order in *Siry Inv., L.P. v. Farkhondehpour* (Sept. 5, 2017, amended Sept. 13, 2017, B260560) 2017 Cal.App.Unpub.LEXIS 6325 [nonpub. opn.].

10

b.      January 2014 requests for document production and special interrogatories regarding financial condition

In mid-January 2014, Siry issued each of the defendants (1) a second set of requests for document production, and (2) special interrogatories.  The document requests sought, among other things, "[a]ll documents that relate, refer or pertain to" each defendant's financial accounts, tangible personal property, intangible personal property, retirement accounts, assets, transfer of assets, liabilities, compensation received and owed, tax records, real property interests, financial records, interest and dividends, and monies owed.  The special interrogatories paralleled the document requests, seeking answers regarding each of the above listed categories of documents.  Siry requested information from January 1, 2010 to mid-January 2014.  Prior to propounding this discovery on defendants' financial condition, Siry sought and obtained an order authorizing such discovery pursuant to Civil Code section 3295, subdivision (c), and making all responses due on February 15, 2014.  At the hearing on Valentine's Day 2014, Siry voluntarily narrowed the scope of its document requests and special interrogatories to only those "financial [documents] presented to third parties."

Defendants did not respond to the narrowed requests by the due date.

The trial court issued two separate orders compelling defendants to respond to these requests and to do so without any objections.  First, on April 4, 2014, the court ordered defendants to "produce responsive documents" and answer the interrogatories without objections by April 23, 2014.  Second, on October 9, 2014, the court adopted the discovery referee's

11

recommendation that defendants respond to this discovery without objection.

   2.   *Defendants' non-compliance with the trial court's orders*

   Notwithstanding the trial court's express warning that continued non-compliance "may result in . . . terminating sanctions," defendants never complied with any of the court's orders because, to this day, defendants have never produced responsive documents or answered the interrogatories without objections.  Instead, defendants responded to the court's orders (1) by serving multiple "responses" that consisted entirely of objections or non-compliant answers (such as "not applicable") without the disclosure of any documents or information, some of which reached nearly 400 pages in length; (2) by repeatedly challenging the court's orders through motions for clarification, reconsideration, relief from waiver, and a stay of discovery; or, as to Farkhondehpour, (3) by making a last-minute offer to come down to Farkhondehpour's or Investment Consultants's office to search for documents.  Worse yet, defendants' counsel below[7] engaged in tactics that can only be characterized as underhanded:  He on July 3, 2014, filed an ex parte motion for clarification of whether the court's earlier April 4, 2014 order required disclosure without objections, but the motion only cited the portion of the court's April 4 minute order setting forth its *tentative* ruling (which said objections could be made) rather than its *actual, final* ruling (which said they could not); Siry was not present at the hearing on the ex parte motion (and thus unable to point out this misrepresentation) because counsel had not

---

[7]   Neman has been represented by new counsel since the terminating sanctions were entered.

12

properly given Siry notice of the ex parte filing; and, after the court granted relief based on the representations in the ex parte filing and Siry subsequently moved the court to reconsider that relief in light of the falsity of those representations, counsel opposed Siry's motion.

3.     *Entry of terminating sanctions*

In its July 2015 oral ruling and August 2015 written order, the trial court granted Siry's June 2015 motion for terminating sanctions against defendants. Defendants' "18 months of lack of compliance" with the [discovery] requests and the multiple court orders compelling responses to those requests, the court found, constituted a "history" of "willful," "flagrant," "persistent[]" and "deliberate" discovery "abuse." In the court's view, defendants' practice of responding to Siry's requests and the court's orders with "document dump[s]" and Farkhondehpour's last-minute offer to look in his and Investment Consultants's warehouse for responsive documents constituted "gamesmanship," not compliance. What is more, defendants' "stall tactics" as to discovery of "significance" to the merits of Siry's claims and of defendants' financial wherewithal (as relevant to punitive damages) "severely prejudiced" Siry "in [its] ability to properly prepare for trial" within the statutory deadline for retrial following remand. In light of this history of non-compliance, the looming deadline for retrial, and ineffectiveness of the prior monetary sanction and threat of terminating sanctions, the court found that "a less severe sanction will clearly not now yield compliance" because defendants' "stall tactics would continue even if the court were to come up with some type of lesser sanction."

B.     *Analysis*

13

The Civil Discovery Act (section 2016.010 et seq.) imbues trial courts with "broad" discretion to sanction the "misuse of the discovery process." (*Lopez v. Watchtower Bible & Tract Society of New York* (2016) 246 Cal.App.4th 566, 604 (*Lopez*); § 2023.030.) As pertinent here, "misuse of the discovery process" includes (1) "[f]ailing to respond [to] or to submit to an authorized method of discovery, (2) "[m]aking an evasive response to discovery," and (3) "[d]isobeying a court order to provide discovery." (§ 2023.010, subds. (d), (f) & (g).) When confronted with such misuse, a court may impose (1) monetary sanctions (§ 2023.030, subd. (a)), (2) sanctions that deem specified issues to be "established" or that "prohibit" the non-compliant party from raising "opposing . . . claims or defenses" (so-called "issue sanctions") (*id.*, subd. (b)), (3) sanctions that preclude the admission of evidence (so-called "eviden[tiary] sanction[s]") (*id.*, subd. (c)), or (4) "terminating sanction[s]," which include "striking [a defendant's] answer" (*id.*, subd. (d)). We review an order granting terminating sanctions for an abuse of discretion. (*Lopez*, at p. 604.) Critically, our task is to assess "whether the trial court abused its discretion in ordering dismissal as a sanction" (*Laguna Auto Body v. Farmers Ins. Exchange* (1991) 231 Cal.App.3d 481, 491), rather than assess "'whether the trial court should have imposed a lesser sanction'" (*Liberty Mutual Fire Ins. Co. v. LcL Administrators, Inc.* (2008) 163 Cal.App.4th 1093, 1105). We review any subsidiary factual findings for substantial evidence. (*Department of Forestry & Fire Protection v. Howell* (2017) 18 Cal.App.5th 154, 192 (*Howell*).)

When faced with a party's misuse of the discovery process, a trial court "should" impose "[t]he penalty . . . appropriate to the dereliction." (*Deyo v. Kilbourne* (1978) 84 Cal.App.3d 771, 793

14

(*Deyo*); *Reedy v. Bussell* (2007) 148 Cal.App.4th 1272, 1293 (*Reedy*).)  That is because the purpose of discovery sanctions is to "protect the interests of the party entitled to[,] but denied[,] discovery," not to "punish[]" the non-compliant party or to "put the prevailing party in a better position than he would have had if he had obtained the discovery sought." (*Deyo*, at p. 793; *Sherman v. Kinetic Concepts, Inc.* (1998) 67 Cal.App.4th 1152, 1163 (*Sherman*); *Doppes v. Bentley Motors, Inc.* (2009) 174 Cal.App.4th 967, 992.)  Proportionality is critical when it comes to terminating sanctions because they altogether deny the non-compliant party a hearing on the merits and thus implicate due process.  (*Lopez*, *supra*, 246 Cal.App.4th at p. 604.)

To ensure proportionality, trial courts should generally take an "incremental" approach—that is, they should "attempt[] less severe alternative[ sanctions]" unless the "record clearly shows lesser sanctions would be ineffective." (*Lopez*, *supra*, 246 Cal.App.4th at p. 604; *Howell*, *supra*, 18 Cal.App.5th at pp. 191-192.)  In calibrating the sanction that is appropriate for the dereliction, trial courts must make a "meaningful effort to determine whether . . . alternative[, lesser sanctions] would be effective" at inducing the non-compliant party to produce the discovery, thereby "protect[ing] the interests of the party entitled to . . . discovery." (*Lopez*, at p. 606; *Deyo*, *supra*, 84 Cal.App.3d at p. 793.)  In undertaking this effort, trial courts should examine the "totality of the circumstances," including: (1) whether the party's non-compliance is the latest chapter in a longer "history of abuse," which looks to "the number of formal and informal attempts to obtain the discovery" as well as whether prior court orders compelling discovery have gone unheeded (*Mileikowsky v. Tenet Healthsystem* (2005) 128 Cal.App.4th 262, 279-280

15

(*Mileikowsky*); *Lang v. Hochman* (2000) 77 Cal.App.4th 1225, 1246 (*Lang*)); (2) whether the party's non-compliance was "willful" (*McGinty v. Superior Court* (1994) 26 Cal.App.4th 204, 212; *Parker v. Wolters Kluwer United States, Inc.* (2007) 149 Cal.App.4th 285, 297 (*Parker*)); (3) whether the non-compliance persisted despite warnings from the court that greater sanctions might follow (*Electronic Funds Solutions, LLC v. Murphy* (2005) 134 Cal.App.4th 1161, 1184 (*Electronic Funds*)); (4) whether the non-compliance encompasses all or only some of the issues in the case (*Reedy*, *supra*, 148 Cal.App.4th at p. 1293); and (5) the extent of the "detriment to the propounding party" that flows from the inability to obtain the discovery at issue (*Lang*, at p. 1246).

Because terminating sanctions are the most "drastic" penalty, they are typically a "last resort" to be "used sparingly." (*Howell, supra*, 18 Cal.App.5th at p. 191; *Lopez, supra*, 246 Cal.App.4th at p. 604; *Deyo, supra*, 84 Cal.App.3d at p. 793.) However, they may still be appropriate "as a first measure" in "extreme cases" where a litigant violates a court order and "persists in the outright refusal to comply with [its] discovery obligations." (*Deyo*, at pp. 793, 795; *Howell*, at pp. 191-192; *Fred Howland Co. v. Superior Court of Los Angeles* (1966) 244 Cal.App.2d 605, 612 (*Fred Howland*).) Put differently, the imposition of lesser sanctions is "not an absolute prerequisite" to the imposition of terminating sanctions for violation of a court order. (*Alliance Bank v. Murray* (1984) 161 Cal.App.3d 1, 10; *Deyo*, at p. 787.)

The trial court in this case did not abuse its discretion in coming to the conclusion, after examining the totality of the circumstances, that terminating sanctions were the appropriate

16

sanction for defendants' non-compliance. Defendants have a fulsome history of discovery abuse: They ignored Siry's two rounds of post-remand discovery and then flouted multiple court orders to provide documents and responses without objection, preferring instead to make multiple motions for clarification and reconsideration, to bury Siry and the court with "document dump[s]," and then to try to avoid the consequences of their discovery misconduct by making feckless, last-minute offers to rummage through their files for responsive documents.

Defendants' conduct was both willful and, worse yet, *calculated*: They frankly admitted, when opposing Siry's motion for leave to file a fifth amended complaint, that they had been "evaluat[ing] the risk" that their willful non-compliance might ripen into terminating sanctions vis-à-vis their maximum exposure under the prior complaint(s). "[A] litigant's conscious decision to deliberately" "evade the discovery process" "based on the perception [that] damages are limited to a particular amount" is inimical to the orderly litigation of disputes. (*Behm v. Clear View Technologies* (2015) 241 Cal.App.4th 1, 10; *Electronic Funds*, *supra*, 134 Cal.App.4th at p. 1178.) For this reason, Farkhondehpour's argument that the terminating sanctions are invalid because Siry's otherwise timely notice fixing the amount of punitive damages was not filed until just before Siry sought terminating sanctions necessarily fails. Further, defendants persisted in their non-compliance despite express warning from the trial court that terminating sanctions were on the horizon. As discussed more fully below, the discovery that defendants steadfastly refused to provide covered a broad swath of issues central to defendants' liability and the measure of damages. And Siry's inability to obtain this discovery for the 18-plus months

17

between its propounding and the court's terminating sanctions order not only deprived Siry of that information, but also left Siry with almost no time on the clock before the three-year period for retrial following remand expired (§ 583.310, subd. (a)(3)).

As this analysis indicates, defendants "persist[ed] in [an] outright refusal to comply with [their] discovery obligations," making this one of the "extreme cases" where terminating sanctions were appropriate in the first instance for violation of a court order because issue and evidentiary sanctions would have been ineffectual. (*Deyo*, *supra*, 84 Cal.App.3d at pp. 793, 795; *Howell*, *supra*, 18 Cal.App.5th at pp. 191-192; *Fred Howland*, *supra*, 244 Cal.App.2d at p. 612; see also *Collisson & Kaplan v. Hartunian* (1994) 21 Cal.App.4th 1611, 1617-1622 [imposing terminating sanctions as a first penalty].) Defendants' assertion on appeal that the trial court made only a "conclusory," "nominal[]," "casual," un-"genuine[]," and "[in]sincere" effort to evaluate lesser sanctions flatly mischaracterizes the record, which shows that the court considered all of the circumstances set forth above. Defendants' further observation that the only defendant previously subject to monetary sanctions was Farkhondehpour overlooks that *all* defendants had engaged in the same underlying discovery misconduct and that misconduct had all been orchestrated by the same attorney; the court thus had ample reason to find that the ineffectiveness of the monetary sanction against Farkhondehpour (and defendants' counsel) applied with equal force to all defendants. And Farkhondehpour's contention that Siry's motion for terminating sanctions was defective because it, and the underlying discovery orders he violated, were unaccompanied by a separate statement or any due date for responses lacks merit because it ignores that

18

a separate statement is not required for a motion for terminating sanctions (Cal. Rules of Court, rule 3.1345(a)) or for a motion to compel when there has been no response (*id.*, rule 3.1345(b)), that the trial court's initial orders to compel set forth due dates, and that its later orders without due dates merely denied defendants' seemingly endless stream of motions for reconsideration and confirmed the earlier orders that defendants had already violated.

### C. *Defendants' arguments*

1. *Are terminating sanctions available when the underlying discovery requests do not encompass all issues in the case?*

Defendants argue that a trial court may issue terminating sanctions against a defendant only if the discovery that a defendant refuses to provide encompasses *all* of the issues to be tried. When a defendant's non-compliance involves anything less than all the issues, they reason, sanctions that terminate the entire proceeding put the propounding party "in a better position than [it] would have [been] . . . had [it] obtained [that] discovery." (*Deyo*, *supra*, 84 Cal.App.3d at p. 793; *Sherman*, *supra*, 67 Cal.App.4th at p. 1163.) Thus, they conclude, the trial court in this case abused its discretion in issuing terminating sanctions because the discovery Siry sought reached only the discrete issues of "alter ego" and defendants' "financial condition," and not every issue in Siry's affirmative case or defendants' proffered affirmative defenses of res judicata and the statute of limitations. Farkhondehpour elaborates on this argument in his reply brief on appeal by asserting that Siry has failed to prove its case was prejudiced by defendants' non-compliance. This argument lacks merit legally and factually.

Defendants' argument is legally flawed for three reasons.

First and foremost, it is inconsistent with the law governing discovery sanctions. That law grants trial courts "broad" discretion to consider "the totality of the circumstances" in making the sanction fit the violation. (*Parker*, *supra*, 149 Cal.App.4th at p. 297; *Lang*, *supra*, 77 Cal.App.4th at p. 1246.) Defendants' proffered rule would trade this flexibility for ossification by converting one factor—namely, the breadth of issues involved in the discovery—from a relevant circumstance into a dispositive one. (*Reedy*, *supra*, 148 Cal.App.4th at p. 1293.) It would also require courts to endure "defiant disobedience" of their orders compelling discovery if those orders pertained to discovery addressing fewer than all the issues in a case, even though trial courts are "not required to allow . . . abuse to continue ad infinitum." (*Mileikowsky*, *supra*, 128 Cal.App.4th at p. 280; *Miranda v. 21st Century Ins. Co.* (2004) 117 Cal.App.4th 913, 929 (*Miranda*).) Not surprisingly, courts have rejected defendants' rule. (E.g., *Miranda*, at pp. 928-929 [affirming terminating sanctions against a plaintiff for non-compliance with order compelling discovery pertaining to causation alone].)

To be sure, some cases contain language that arguably supports the issue-based limitation on discovery sanctions urged by defendants. In *Caryl Richards, Inc. v. Superior Court* (1961) 188 Cal.App.2d 300 (*Caryl Richards*), the court stated that a trial court "abuses its discretion" "when its [sanctions] order . . . denies a party any right to defend the action or to present evidence upon issues of fact which are entirely unaffected by the discovery procedure before it." (*Id.* at p. 305.) But the non-complying party in *Caryl Richards* had complied with every discovery request and order except an order to disclose the chemical formula of its hairspray, which it asserted was a trade secret (*id.* at pp. 301-

20

305); on those facts, *Caryl Richards* held, a terminating sanction went too far. *Caryl Richards* did not speak to parties, like defendants here, who have steadfastly refused to comply with multiple discovery requests or orders. Nor do any of the other cases cited by defendants. (E.g., *McArthur v. Bockman* (1989) 208 Cal.App.3d 1076, 1080-1081 [party's non-compliance limited to information regarding its wealth; terminating sanctions held excessive]; *Wilson v. Jefferson* (1985) 163 Cal.App.3d 952, 958-959 [party's non-compliance limited to discovery regarding affirmative defense; terminating sanctions held excessive]; *Lopez*, *supra*, 246 Cal.App.4th at p. 606 [party's non-compliance limited to information regarding other victims of sexual abuse not involved in the case; terminating sanctions held excessive]; *Thomas v. Luong* (1986) 187 Cal.App.3d 76, 81-82 [party's non-compliance limited to failure to appear for deposition, but party offered to stipulate to liability; terminating sanctions held excessive].)

Second, a rule prohibiting trial courts from issuing terminating sanctions unless the discovery in question encompasses every issue in a case would incentivize litigants to engage in behavior that is inimical to the Civil Discovery Act's purposes of "'enhanc[ing] the truth-seeking function'" of litigation and "'eliminat[ing] trial strategies that focus on gamesmanship and surprise.' [Citation.]" (*Jaurez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377, 389.) On the one hand, litigants served with discovery requests encompassing fewer than every issue would be immune from terminating sanctions, and thus freer to ignore those requests—or orders compelling compliance with them—because the maximum sanction would be an issue or evidentiary sanction. But selective lawlessness is still

21

lawlessness, and is something our system of justice does not tolerate. (*Electronic Funds*, *supra*, 134 Cal.App.4th at p. 1178 ["[I]f a [litigant] chooses to participate [in litigation], he or she must play by the rules."].) This is just as true for a rule that would enable—and hence encourage—such lawlessness by defendants alone, for whom terminating sanctions mean an adverse damages award. And where, as here, discovery is propounded on remand, terminating sanctions are likely never to be available because any post-remand discovery, to avoid being duplicative of the discovery propounded prior to trial and appeal, is likely to be more limited in scope (in terms of time or subject matter). This impermissibly rewrites the Civil Discovery Act by deleting terminating sanctions as an option after a remand. (See *Fairmont Ins. Co. v. Superior Court* (2000) 22 Cal.4th 245, 250-251 [noting that Civil Discovery Act applies post-remand].) On the other hand, under defendants' proposed rule, litigants seeking to keep terminating sanctions as an available remedy would have every incentive to propound overly broad discovery requests, a result also at odds with the efficient exchange of information. We decline to construe the Civil Discovery Act in a way that creates such perverse incentives. (E.g., *Pacific Sunwear of California, Inc. v. Olaes Enterprises, Inc.* (2008) 167 Cal.App.4th 466, 480.)

Third, a party seeking terminating sanctions for another party's discovery misconduct need not prove prejudice where, as here, the misconduct relates to discovery the moving party propounded. (*Electronic Funds*, *supra*, 134 Cal.App.4th at p. 1184 [rejecting argument that, absent a showing of prejudice, terminating sanctions constitute a "windfall"]; cf. *Parker*, *supra*, 149 Cal.App.4th at p. 301 ["nonpropounding party" may obtain

terminating sanctions "only if . . . [it] shows it suffered a detriment as the result of the sanctioned party's misuse of the discovery process"].)  This rule makes sense.  A prejudice requirement would be "difficult," if not "impossible," for a propounding party to meet because a showing of prejudice would likely turn on the significance of the information that the non-compliant party is refusing to disclose.  (*Electronic Funds*, at p. 1184.)  A prejudice requirement would also empower intransigent parties to continue their intransigence on the ground that the documents they were withholding are not that important.  As we noted above, such selective lawlessness is still lawlessness.

Defendants' argument is also factually flawed.  Contrary to what defendants represent in their briefs, Siry's discovery encompassed far more than the issues of alter ego and defendants' financial condition.  The mid-October 2013 requests sought documents involving the workings and finances of—as well as each defendant's interests in—the various entities (416 South Wall Street, DTLA and Investment Consultants) used to effectuate the allegedly improper diversion of the partnership's cash distributions.  The January 2014 requests sought documents and answers to special interrogatories regarding each defendants' finances.  Together, these requests sought more recent documents relevant to show whether defendants had, in fact, improperly diverted the partnership's cash distributions; to show *which* defendants had done so, which, as we noted in the prior appeal, was "key"; and to show what assets each defendant had available to satisfy any verdict for punitive damages.  Thus, these requests spanned a broad swath of subjects that went to the heart of the retrial that Siry, in late 2013 and early 2014, expected to prosecute.  (Accord, *Rawnsley v. Superior Court* (1986) 183

23

Cal.App.3d 86, 91 [discovery seeking documents that would show that "assets have been converted and diverted" are "fundamental to [a plaintiff's] case"]; *In re Marriage of Michaely* (2007) 150 Cal.App.4th 802, 810 [discovery seeking more updated information is appropriate].)

      2.    *Did the trial court err in issuing terminating sanctions notwithstanding Neman's assertion of the privilege against self-incrimination?*

Neman alone argues that the trial court lacked the authority to issue terminating sanctions against him once he asserted the privilege against self-incrimination.

      a.    Additional facts

On September 19, 2014, a federal grand jury in Los Angeles indicted Neman, in his capacity as Chief Executive Officer of a company called Pacific Eurotex, for evading federal currency reporting requirements while laundering drug trafficking proceeds.

Although the indictment occurred long after Siry had propounded its discovery requests, after Neman had violated numerous court orders compelling production without objections, and after the court's penultimate pre-terminating sanctions discovery order of October 9, 2014, Neman on October 22, 2014 invoked the privilege against self-incrimination in seeking a stay of this case pending resolution of the criminal case, which the trial court denied but then granted a continuance of the trial date to account for Neman's unavailability as a witness. Neman also served on October 27, 2014 supplemental discovery responses objecting to every request "based on his Fifth Amendment privilege rights." The trial court overruled that objection in its terminating sanctions order, finding that it was "not going to

24

relitigate the basis or validity of [its pre-assertion] orders [compelling production]."

### b. Analysis

The Fifth Amendment's guarantee that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself" operates as a defense to civil discovery, if timely asserted. (U.S. Const., 5th Amend.; Cal. Const., art. I, § 15; § 2017.010 [discovery reaches "any matter, *not privileged*"], italics added; *Fuller v. Superior Court* (2001) 87 Cal.App.4th 299, 305 (*Fuller*) ["Privileged matters . . . lie beyond the reach of discovery . . ."].) This privilege against self-incrimination reaches only those communications that are (1) compelled, (2) testimonial, and (3) incriminating. (*United States v. Doe* (1984) 465 U.S. 605, 611 (*Doe*).)

In assessing whether the privilege applies to excuse compliance with the Civil Discovery Act, courts ask two questions.

First, is the requested disclosure protected by the privilege? Because the responses to Siry's discovery requests would "'disclose the contents of [Neman's] mind'" and therefore are testimonial (*Pa. v. Muniz* (1990) 496 U.S. 582, 594, quoting *Curcio v. United States* (1957) 354 U.S. 118, 128), the applicability of the privilege here turns on whether the discovery sought is "incriminating" and "compelled." As a general matter, a communication is "incriminating" if it "furnish[es] a link in the chain of evidence needed to prosecute the claimant for a . . . crime." (*Hoffman v. United States* (1951) 341 U.S. 479, 486 (*Hoffman*).) And because a litigant's "say-so does not of itself establish the hazard of incrimination" (*ibid.*), the litigant bears the burden of "object[ing] with specificity," which triggers the

25

trial court's duty to "'conduct[] "a particularized inquiry, deciding, in connection with each specific area that the [propounding] party seeks to explore, whether or not the privilege is well-founded."' [Citation.]" (*Warford v. Medeiros* (1984) 160 Cal.App.3d 1035, 1045 (*Warford*), italics omitted; *In re Marriage of Sachs* (2002) 95 Cal.App.4th 1144, 1151 (*Sachs*); *Alpha Media Resort Investment Cases* (2019) 39 Cal.App.5th 1121, 1133.)

In assessing whether the special interrogatories are privileged in this case, Neman's answers would be compelled (because he was being compelled by the court to respond to them), but would be incriminating only if it is "evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." (*Hoffman, supra*, 341 U.S. at pp. 486-487; *People v. Seijas* (2005) 36 Cal.4th 291, 304.) In assessing whether the production of documents is privileged in this case, Neman's *creation* of the documents to be produced was not compelled because he voluntarily created those documents (*Doe, supra*, 465 U.S. at p. 612), but his act of production would be compelled (again, because he was being compelled by the court to produce them). However, his act of production would be incriminating only if that act "'admit[ted]'" facts previously unknown to Siry—namely, "'that the [responsive documents] existed, were in his possession or control, and were authentic.' [Citation.]" (*United States v. Hubbell* (2000) 530 U.S. 27, 36.)

Second, if the requested discovery responses are found to be covered by the privilege, what should the court do about it? Because a pending criminal indictment does not give a person "'a blank check to block all civil litigation on the same or related

26

underlying subject matter,'" the trial court must "assess[]" "'the nature and substantiality of the injustices claimed'" by the propounding and responding parties, and seek to "fairly balance" their interests, preferably by "accommodat[ing]" those "competing interests." (*Fuller*, *supra*, 87 Cal.App.4th at pp. 306-307; *Pacers, Inc. v. Superior Court* (1984) 162 Cal.App.3d 686, 690; *Avant! Corp. v. Superior Court* (2000) 79 Cal.App.4th 876, 882.)

The trial court did not err in overruling Neman's assertion of the privilege against self-incrimination for three reasons.

First, Neman never "object[ed] with specificity." Instead, he responded with a blanket objection to all discovery without any attempt to explain how any answers he would provide to the special interrogatories or how his act of producing the requested documents would incriminate him for crimes involving Pacific Eurotex, a company nowhere mentioned in this litigation. Such a "blanket refusal to testify [or provide discovery responses] is unacceptable" and insufficient to constitute an assertion of the privilege. (*Sachs*, *supra*, 95 Cal.App.4th at p. 1151; *Warford*, *supra*, 160 Cal.App.3d at p. 1044 ["'[T]here is no blanket Fifth Amendment right to refuse to answer questions.'"].) Neman responds that he never made a "'blanket refusal'" because he repeated the same boilerplate refusal for each individual discovery request, but Neman's mastery of the cut-and-paste feature to refuse to answer each individual request is functionally indistinguishable from a blanket refusal. Neman also faults Siry for not filing a further motion to compel in order to flesh out Neman's defective invocation of the privilege, but the burden of invoking the privilege is on its holder (*Sachs*, at pp. 1151-1152) and we decline to adopt a rule shifting the burden onto the opposing party to remedy a defective invocation.

27

Second, even if we ignored Neman's defective assertion of the privilege, Neman has not carried his burden of showing that an "injurious disclosure could result" (*Hoffman*, *supra*, 341 U.S. at pp. 486-487) by "demonstrat[ing] some 'nexus' between the information requested [by Siry] and the risk of criminal prosecution and conviction." (*Troy v. Superior Court* (1986) 186 Cal.App.3d 1006, 1012.) Neman was indicted for various currency transactions involving Pacific Eurotex from 2012 through 2014; the discovery sought in this case involves the dealings of several corporations and a limited partnership—none of which Neman contends has any associations with Pacific Eurotex—between 2002 and 2010, as well as Neman's financial data from January 2010 through January 2014. The requisite nexus is absent. Neman points to his attorney's declaration, filed with a motion to stay or continue the trial, that a nexus exists because Neman was charged with money laundering and the discovery in this case would require him to respond to questions about his financial holdings. However, this explanation— namely, any question about money is privileged whenever someone is charged with money laundering—is at far too high a level of generality to establish the requisite showing of a "danger" of "injurious disclosure," especially where, as here, Neman operates numerous entities that may or may not have intertwined financial dealings. This argument also provides no basis for extending the privilege to the non-financial discovery sought by Siry's October 2013 requests for production of documents regarding liability.

Neman asserts that he need not establish any nexus because (1) his attorneys in the criminal matter recommended that he assert the Fifth Amendment privilege in this case, (2) the

28

trial court has yet to conclude there is *no* nexus, (3) the trial court already determined that there *was* a nexus because it briefly continued the trial on the basis of his Fifth Amendment objection, (4) a trial court in a different case stayed that case against Neman, and (5) this court has already determined that there was a nexus because we issued an alternative writ in 2017 directing the trial court to sustain Neman's Fifth Amendment objection to six document requests (for the period starting January 1, 2015, as limited by the trial court) posed during a 2017 debtor's examination.[8]

Each of these assertions is meritless. A trial court is required to assess for itself whether a "nexus" exists, not just take the word of a party's lawyer on that issue. The trial court never ruled on whether there is a nexus between the indictment and Siry's discovery because Neman never asserted a specific objection; his assertion of an ineffectual, blanket objection does not somehow excuse him from having to prove that his interrogatory answers and act of producing documents posed a danger of incriminating him. The trial court's grant of a brief continuance of trial was due to Neman's unavailability as a witness, not because responding to Siry's pending discovery requests might prove incriminating. (See, e.g., Evid. Code, § 240 [defining unavailability of a witness].) Whether a nexus exists between the pending charges and the allegations of a *different* case says nothing about whether such a nexus exists in this case. And our issuance of an alternative writ with regard to specific

---

[8]     We grant Neman's motion to augment the record and for judicial notice of documents related to the debtor's examination and writ proceedings. (Evid. Code, §§ 452, subd. (d), & 459, subd. (a).)

objections Neman made to different document requests covering a different time period cannot cure the deficiency of his blanket assertion of privilege to Siry's discovery, particularly when Neman ultimately withdrew his writ petition.

Lastly, even if we ignored Neman's defective assertion of the privilege and the absence of any nexus, Neman did not assert his Fifth Amendment privilege until October 2014, long after Siry propounded its discovery and the trial court repeatedly ordered Neman to respond. In arguing that his October 2014 assertion of the privilege renders the trial court's terminating sanctions ruling improper, Neman is effectively arguing that a litigant's assertion of the privilege against self-incrimination retroactively excuses prior misuse of the discovery process. This argument is legally unfounded. (Cf. *Brown v. Superior Court* (1986) 180 Cal.App.3d 701, 712 ["privilege against self-incrimination" may be "waived by a failure to make a timely objection"].) It is also factually unfounded, as the trial court's terminating sanctions order was based upon Neman's contumacious conduct in ignoring the court's orders, and *not* upon any assertion of the privilege against self-incrimination after those orders were issued. (Cf. *Alvarez v. Sanchez* (1984) 158 Cal.App.3d 709, 712-713 [noting that "striking of the defendant's answer and the resultant default procedure are too harsh a sanction for exercising" the privilege against self-incrimination].) Contrary to what Neman suggests, it also does not matter that Siry amended its operative complaint to allege specific damages demands *after* he (defectively) asserted the privilege. He had proper notice of those allegations by the time his answer was struck and default was entered (§ 580, subd. (a)); more to the point, Neman had the power to assert the

30

privilege more specifically after Siry amended its complaint but nonetheless chose to rest on his defective, blanket objection.

3.      *Is the trial court's finding that Farkhondehpour never complied with its orders supported by substantial evidence?*

Farkhondehpour alone argues that he did, in fact, comply with the trial court's multiple orders compelling responses, without objection, to Siry's October 2013 and January 2014 discovery requests.

Farkhondehpour certainly *responded* to Siry's discovery requests.  In response to Siry's October 2013 requests for production, Farkhondehpour filed (1) untimely responses with objections in February 2014 explaining why he was not going to provide any responsive documents because the documents sought (a) pertained to non-compensable damages (that is, damages waived when the prior lawsuit between the parties was settled in 2007), (b) had already been produced prior to remand (but additional copies would be made available at Farkhondehpour's office), or (c) did not exist; and (2) supplemental responses in June 2015 that (a) preserved objections, and (b) explained why he was still not going to provide any responsive documents because the documents sought (i) had already been produced or were otherwise in Siry's possession, (ii) never existed, or (iii) were "available" for inspection at Investment Consultants's offices.  In response to Siry's January 2014 requests, Farkhondehpour filed (1) a single blanket objection in April 2014 explaining that he was not going to provide any responsive documents or answer any interrogatories because the discovery sought was "unnecessarily burdensome, harassing and overbroad"; and (2) supplemental responses in June 2015 that (a) preserved objections, (b) explained that any documents responsive to the production requests did not exist or were "available" for inspection at

Investment Consultants's office, (c) provided answers to the vast majority of the special interrogatories (54 out of the 65 posed to Farkhondehpour individually and 80 out of the 112 posed to Farkhondehpour as trustee) that the interrogatory was "not applicable," had no response, or was duplicative, and (c) provided answers to the remaining interrogatories and attached eight pages of spreadsheets.

Substantial evidence supports the trial court's finding that these responses did not constitute compliance. Farkhondehpour was ordered to produce every document requested and answer every special interrogatory posed without objection. Farkhondehpour never did so. Farkhondehpour points to his offers to open up the doors to his (or Investment Consultants's) warehouse for Siry to come in and hunt for documents. But this is not what the trial court ordered. To treat Farkhondehpour's "[l]ast-minute tender of documents" as wiping away the prior 16 to 20 months of intransigence would impermissibly "reward . . . brinksmanship." (*Sauer v. Superior Court* (1987) 195 Cal.App.3d 213, 230.) Farkhondehpour says that he provided Siry with financial documents pertaining to four different companies during settlement negotiations, but those documents constituted an infinitesimal portion of the requested discovery. Farkhondehpour lastly asserts that Siry judicially admitted that it had received satisfactory responses to its discovery responses; this is a flat-out misrepresentation of the record.

## II.    Amount of the Default Judgment

Defendants challenge the trial court's award of (1) treble damages under Penal Code section 496, subdivision (c), and (2) attorney fees. In its cross-appeal, Siry challenges the trial court's recalculation of treble damages, its reduction in punitive

damages, and its requirement that Siry elect between treble and punitive damages on the ground that defendants lacked standing to make the motion for new trial that prompted the court to reduce the amount of the default judgment.[9] We will address the second issue first.

### A.    *Standing to move for a new trial*

Siry argues the trial court erred in amending the default judgment in response to defendants' motion for new trial not because the amendments were incorrect, but because defendants, as parties in default, did not have standing to make such a motion at all.  Because this argument requires us to construe the new trial statute and resolve other questions of law, our review is de novo.  (*John v. Superior Court* (2016) 63 Cal.4th 91, 95 (*John*); *Greene v. Marin County Flood Control & Water Conservation Dist.* (2010) 49 Cal.4th 277, 287.)

An "aggrieved party" may move the trial court to "vacate[]" a "verdict" or "other decision" and "grant[]" "a new or further trial" if, among other reasons, that party can show an "[e]rror in law, occurring at the trial and excepted to by the party making the application" if that error "materially affect[ed] [its] substantial rights."  (§ 657, subd. (7).)  But may a "party" *in*

---

[9]    Defendants do not challenge the trial court's calculation of actual damages, and Siry does not challenge the court's requirement that Siry elect between treble and punitive damages, the reduction in the punitive damages award, or the offset for costs defendants incurred during the prior appeal.  And although Siry suggests that the trial court's calculation of treble damages was incorrect, we decline to entertain that suggestion because Siry waited until its reply brief to raise it.  (*Garcia*, *supra*, 16 Cal.4th at p. 482, fn. 10.)

33

*default* move for a *new* trial when, by virtue of the default, there was no trial in the first place?

We conclude that the answer is "yes," at least when the party is seeking to move for a new trial on the ground that the court made an "error in law" in calculating damages. Although the entry of default precludes the defaulting defendant from further participation in the proceedings (and thus from "except[ing] to" the error during the prove-up hearing) (*Devlin v. Kearny Mesa AMC/Jeep/Renault* (1984) 155 Cal.App.3d 381, 385 (*Devlin*); *Forbes v. Cameron Petroluems, Inc.* (1978) 83 Cal.App.3d 257, 262; *Christerson v. French* (1919) 180 Cal. 523, 525), the plaintiff still bears the burden of proving its entitlement to damages to the court. (*Barragan v. Banco Bch* (1986) 188 Cal.App.3d 283, 302; § 585, subd. (b).)

More to the point, the entry of default does not entirely render a defaulting defendant persona non grata. Even a defaulting defendant may appeal the resulting default judgment on the grounds that the damages award (1) "is so disproportionate to the evidence as to suggest that the verdict was the result of passion, prejudice or corruption" (*Uva v. Evans* (1978) 83 Cal.App.3d 356, 363 (*Uva*)), (2) "is so out of proportion to the evidence that it shocks the conscience of the appellate court" (*ibid.*), or (3) is "contrary to law" (see *Lasalle v. Vogel* (2019) 36 Cal.App.5th 127, 139 [defaulting party may appeal refusal to set aside verdict on these grounds]).

Because a defaulting defendant can appeal a default judgment on these grounds, "[w]e see no reason to preclude [that defendant] from seeking a new trial (or, more precisely, a new judgment hearing) on th[ose] ground[s] . . ." (*Don v. Cruz* (1982) 131 Cal.App.3d 695, 704 (*Don*); *Jacuzzi v. Jacuzzi Bros.* (1966)

34

243 Cal.App.2d 1, 23-24; *Misic v. Segars* (1995) 37 Cal.App.4th 1149, 1154.) Allowing a defaulting party to bring excessive damages based on errors in law to the trial court's attention in a new trial motion puts those potential errors before the court with greater familiarity with the case, does so in a manner likely to yield a faster result, and may thereby altogether obviate the need for an appeal. (Accord, *Don*, at p. 705.) Our Supreme Court has held that parties may not "challenge [a] damage award on appeal[] without [first making] a motion for a new trial"; to do otherwise is to "unnecessarily burden the appellate courts with issues which can and should be resolved at the trial level." (*Shroeder v. Auto Driveway Co.* (1974) 11 Cal.3d 908, 919.) That logic applies with equal force here.

Siry resists this conclusion with four arguments.

First, it cites language from *Howard Greer Custom Originals v. Capritti* (1950) 35 Cal.2d 886 (*Howard Greer*), where our Supreme Court stated that a defaulting defendant "cannot . . . move for a new trial" because it "is out of court and is not entitled to take any further steps in the" case. (*Id.* at pp. 888-889.) Seven years later, however, the Supreme Court in *Carney v. Simmonds* (1957) 49 Cal.2d 84 (*Carney*), retreated from *Howard Greer*'s sweeping language when it held that a new trial motion is appropriate in many different situations "except possibly in the case of default judgments . . . where there may be the question of the right of the moving party to make any objection to the judgment." (*Id.* at p. 90.) Because defaulting defendants may appeal the damages award of a default judgment in the three circumstances delineated above, they have the "right . . . to make an[] objection to the judgment" and thus, under

35

*Carney*, may also move for a new trial in those same circumstances.

Second, Siry urges that a close reading of the cases allowing defaulting defendants to move for a new trial reveals a four-part classification scheme, and that under that scheme, only defendants who challenge damages as being excessive due to insufficiency of the evidence (rather than due to legal errors) may file a motion for new trial. This makes sense, Siry continues, because the plaintiff at a default prove-up hearing can be faulted only for presenting insufficient evidence but not for errors in law made by the court. None of the cases Siry cites even hints at the rule Siry purports to draw from them; indeed, some have nothing to do with excessive damages at all. More to the point, Siry's proffered rule is wholly inconsistent with the judicial economy-based rationale for allowing defaulting defendants to file a motion for new trial as to legal errors they can challenge on appeal because Siry's rule would preclude new trial motions for issues that are clearly subject to challenge on appeal. What is more, Siry's proffered blame-based rationale for its rule is a fiction, as the facts of this case vividly illustrate. *Siry* is the party who urged the trial court to award quadruple damages on top of punitive damages and who then offered a spirited defense of that position in opposing defendants' motion for new trial, rendering hollow its claim on appeal that plaintiffs are invariably blameless for a trial court's legal errors.

Third, Siry contends that a defaulting party's right to challenge disproportionate or legally erroneous damages awards on appeal should, at best, authorize that party to file a motion for relief under section 473, but not a motion for new trial. But section 473 provides relief for mistakes made *by a party or its*

*counsel* (§ 473, subd. (b)) and for void judgments (*id.*, subd. (d)), and provides no relief for errors of law by a court in awarding "damages which are excessive as a matter of law." (*Don*, *supra*, 131 Cal.App.3d at pp. 702-703.) The proper vehicle for getting such issues before the trial court that entered the default judgment is a motion for new trial.

Fourth, Siry cites cases holding that a defaulting defendant may not file a motion for new trial under any circumstances. (E.g., *Devlin*, *supra*, 155 Cal.App.3d at pp. 385-386; *Brooks v. Nelson* (1928) 95 Cal.App. 144, 147-148.) We respectfully part ways with these decisions, which did not consider the rationale we adopt—namely, that there is no reason to deprive the trial court of the power to consider challenges to the excessiveness or legal propriety of damages when those very same issues can undoubtedly be raised on appeal.

In this case, defendants' challenges to the damages awarded in the original default judgment all constitute "error[s] in law" properly subject to a motion for a new trial. The court's recalculation of treble damages reduced what was effectively quadrupled damages down to treble damages; the court's reduction of the punitive damages award was grounded in the constitutional law defining when such damages become so excessive as a matter of law as to deny a defendant due process; and the court's ruling that Siry must elect between treble and punitive damages involved construction of the law. (Cf. *Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 507 [only trial

37

court may sit as a "thirteenth juror" in evaluating the amount of damages].)**10**

---

**10**    Because these reasons for granting a new trial all involve "error[s] in law" cognizable under subdivision (7) of section 657 rather than any reweighing of the evidence (*Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 122 [distinguishing challenges to the excessiveness of damages based on the evidence presented from a court's "failure to apply the proper legal measure of damages"]; *Gober v. Ralph's Grocery Co.* (2006) 137 Cal.App.4th 204, 214 ["in deciding the constitutional maximum [for punitive damages], a court does not decide whether the verdict is unreasonable based on the facts"]), Siry's belatedly developed argument that the trial court's new trial order is void because it cites subdivision (5) of section 657 is not well taken.  To be sure, the court cited only subdivision (5) and that subdivision requires a trial court to "weigh[] the evidence" (§ 657, second paragraph).  But it is clear from the trial court's reasons for granting a new trial that the court cited the wrong statutory ground for relief.  A court's failure to state the proper *ground* for relief under section 657 does not abrogate its *reasons* for granting that relief.  (*Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 634 ["'the words "ground" and "reason" have different meanings,'" and "[t]he word 'ground' refers to any of the seven grounds listed in section 657"]; *Previte v. Lincolnwood, Inc.* (1975) 48 Cal.App.3d 976, 988 [reviewing court is "confined" "to the specific *reason or reasons* given by the trial court for [its new trial] order"], italics added.)  More to the point, it does not void the new trial order (*Sandoval v. Qualcomm Inc.* (2018) 28 Cal.App.5th 381, 421-424 [trial court's citation to the "wrong subdivision" of section 657 does not void new trial order when its reason was valid under a different subdivision], review granted on other grounds, Jan. 16, 2019, S252796; see also *Sanchez-Corea v. Bank of America* (1985) 38 Cal.3d 892, 906 [trial court's failure to specify ground for relief does not void its new trial order]), at least where, as here, a new trial was sought

38

**B.** *Propriety of certain damages awards*

Defendants argue that the trial court erred in awarding treble damages under Penal Code section 496, subdivision (c) and in awarding attorney fees. When entering judgment against a defaulting defendant, a trial court acts as a "gatekeeper," not a rubber stamp. (*Kim v. Westmoore Partners, Inc.* (2011) 201 Cal.App.4th 267, 272 (*Kim*); *Electronic Funds*, *supra*, 134 Cal.App.4th at p. 1179.) This is a "serious" and sober responsibility (*Kim*, at pp. 272-273), requiring the court to assure itself that the plaintiff has made a "prima facie case" showing entitlement to each type of damages under (1) the relevant statute, contract, or legal doctrine, and (2) the well-pled allegations in its operative complaint. (*Johnson v. Stanhiser* (1999) 72 Cal.App.4th 357, 361-362; *Los Defensores*, *supra*, 223 Cal.App.4th at pp. 392-393.) In undertaking this task, the court must accept as true all "well-pled[] allegations" in the operative complaint, but need not accept "contentions, deductions or conclusions of fact or law." (*Evans*, *supra*, 38 Cal.4th at p. 6.) Where, as here, the relief challenged on appeal has "penal attributes" (as both treble damages and attorney fees do (*Rony v. Costa* (2012) 210 Cal.App.4th 746, 757 (*Rony*))), the trial court must also require the plaintiff to "strict[ly] compl[y]" with all statutory prerequisites for that relief (*Baker v. San Francisco Gas & Electric Co.* (1904) 141 Cal. 710, 712). We independently review a trial court's ruling that the complaint entitles a plaintiff

---

on the ground corresponding with the trial court's reasons (*Collins v. Sutter Memorial Hospital* (2011) 196 Cal.App.4th 1, 16-17 ["A new trial order 'can be granted only on a ground specified in the motion.'"], citation omitted).

to damages where, as here, that ruling rests on questions of statutory interpretation and the application of undisputed facts to the law.  (*John*, *supra*, 63 Cal.4th at p. 95; *Martinez v. Brownco Construction Co.* (2013) 56 Cal.4th 1014, 1018.)

       1.    *Treble damages and attorney fees under Penal Code section 496, subdivision (c)*

Penal Code section 496 is entitled "Receiving or concealing stolen property."  (Pen. Code, § 496.)  Subdivision (a) makes it a crime to (1) "buy[] or receive[] any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained," or (2) "conceal[], sell[], [or] withhold[] any property from the owner, knowing the property to be so stolen or obtained."  (*Id.*, subd. (a).)  Subdivision (c) empowers "[a]ny person who has been injured by a violation of subdivision (a)" to "bring an action for three times the amount of actual damages [he has ] . . . sustain[ed]" as well as for "costs of suit[] and reasonable attorney's fees."  (*Id.*, subd. (c).)

This case presents the question:  Does Penal Code section 496, subdivision (c) authorize Siry to obtain treble damages where the underlying conduct did not involve trafficking in stolen property, but rather the improper diversion of a limited partnership's cash distributions through fraud, misrepresentation, and breach of fiduciary duty?

The courts have taken different approaches to the issue.

Siry urges that we follow *Switzer*, *supra*, 35 Cal.App.5th 116, *Bell v. Feibush* (2013) 212 Cal.App.4th 1041 (*Bell*), *Worldwide Travel, Inc. v. Travelmate US, Inc.* (S.D. Cal. 2016) 2016 U.S. Dist. LEXIS 43942 (*Worldwide Travel*), and *Allure Labs, Inc. v. Markushevska* (N.D. Cal. 2019) 606 B.R. 51, 63-66 (*Allure Labs*).  These cases hold that treble damages are available whenever the defendant's underlying conduct involves any type of

fraudulent conduct or misrepresentation. (*Switzer*, at pp. 119-120 [fraud, conversion of property; treble damages available]; *Bell*, at p. 1043 [theft by false pretense; treble damages available]; *Worldwide Travel*, at *18-23 [conversion, theft by false pretenses; treble damages available]; *Allure Labs*, at pp. 57-58 [embezzlement; treble damages available].) Their holdings rest on a literal reading of the Penal Code: Section 496, subdivision (a) reaches the "recei[pt of] . . . property . . . that has been obtained in any manner constituting *theft*" (Pen. Code, § 496, subd. (a), italics added), and "theft" is elsewhere defined to include "fraudulently appropriat[ing] property which has been entrusted to him or her" or "knowingly and designedly, by any false or fraudulent representation or pretense, defraud[ing] any other person of money, labor or real or personal property" (*id.*, § 484, subd. (a)), so Penal Code section 496, subdivision (c) must authorize treble damages for any type of conduct qualifying as "theft," including fraud, conversion, and theft by false pretenses. (*Switzer*, at pp. 126-131; *Bell*, at pp. 1045-1049.)

Defendants urge that we follow *Lacagnina v. Comprehend Systems, Inc.* (2018) 25 Cal.App.5th 955 (*Lacagnina*), *Grouse River Outfitters Ltd. v. NetSuite, Inc.* (N.D. Cal. 2016) 2016 U.S. Dist. LEXIS 141478 (*Grouse River*), and *Agape Family Worship Ctr., Inc. v. Gridiron* (C.D. Cal. 2018) 2018 U.S. Dist. LEXIS 91338 (*Agape Family*). For various reasons, each of these cases has rejected *Bell's* declaration that "[a]nything that could be the subject of a theft can also be property under Penal Code section 496" (*Bell, supra,* 212 Cal.App.4th at p. 1049). *Lacagnina* viewed *Bell's* declaration as "broad dictum," and went on to reject the plaintiff's argument that Penal Code section 496 applied to a theft of labor; "that labor may be the object of a 'theft,'"

41

*Lacagnina* reasoned, "does not transform it into 'stolen property.'" (*Id.* at pp. 969-970.) *Grouse River* and *Agape Family* both rejected treble damages because, in their view, the civil defendant's initial "theft" of the property through fraud precluded treble damages for the simultaneous act of receiving that "stolen" property. (*Grouse River*, at *38-40; *Agape Family*, at *1-2, 14-15.)

We chart yet a different path in ruling that treble damages are not available under Penal Code section 496, subdivision (c) in cases where the plaintiff merely alleges and proves conduct involving fraud, misrepresentation, conversion, or some other type of theft that does not involve "stolen" property.

The "first task" of any court "in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386.) Although "the words of [a] statute" "[o]rdinarily" "provide the most reliable indication of legislative intent" (*People v. Vidana* (2016) 1 Cal.5th 632, 638), this "'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose." (*Lungren v. Duekmejian* (1988) 45 Cal.3d 727, 735).

Time and again, our Supreme Court has refused to "'presume that the Legislature intends, when it enacts a statute, to overthrow long-established principles of law unless such intention is clearly expressed or necessarily implied.'" (*Brodie v. Workers' Comp. Appeals Bd.* (2007) 40 Cal.4th 1313, 1325, quoting *People v. Superior Court* (*Zamudio*) (2000) 23 Cal.4th 183, 199); *Van Horn v. Watson* (2008) 45 Cal.4th 322, 333, superseded by statute on another ground as stated in *Ennabe v. Manosa* (2014) 58 Cal.4th 697, 719.) The reason for this refusal

is a pragmatic one—namely, that "[i]t is doubtful that the Legislature would . . . institute[] . . . significant change through silence." (*Riverside County Sheriff's Dept. v. Stiglitz* (2014) 60 Cal.4th 624, 646-647; see also *In re Christian S.* (1994) 7 Cal.4th 768, 782 ["reject[ing] the view that the Legislature silently enacts major social policy"].)

In our view, reading Penal Code section 496 to authorize an award of treble damages whenever a plaintiff proves (or, in the case of a default, sufficiently alleges) any type of theft—whether it be fraud, misrepresentation, conversion, or breach of fiduciary duty—by which the defendant obtains money or property would institute a "significant change" for two reasons.

First, it would transmogrify the law of remedies for those torts. Until now, the damages remedy for these torts has been limited to the amount of damages actually caused by the fraud, misrepresentation, conversion or breach of fiduciary duty. (Civ. Code, § 3333 [defining damages "[f]or the breach of an obligation not arising from contract" as "the amount which will compensate for all the detriment proximately caused thereby . . ."]; *Fragale v. Faulkner* (2003) 110 Cal.App.4th 229, 236 [applying this measure of damages to tort of fraud not involving real property]; *Benson v. Southern California Auto Sales, Inc.* (2015) 239 Cal.App.4th 1198, 1208 [applying this measure of damages to tort of misrepresentation]; *Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1583 [applying this measure of damages to tort of breach of fiduciary duty]; *Persson v. Smart Inventions, Inc.* (2005) 125 Cal.App.4th 1141, 1165 ["fraud damages are [calculated] under the out-of-pocket loss rule"]; Civ. Code, § 3336 [damages for wrongful conversion is the "value of the property at the time of the conversion" plus "fair compensation for the time and money

43

properly expended" in its pursuit].)  Treble damages under Penal Code section 496, if held applicable to these torts, would all but eclipse these traditional damages remedies.  (Accord, *Lacagnina*, *supra*, 25 Cal.App.5th at p. 972 ["If every plaintiff in an employment or contract dispute could also seek treble damages" under Penal Code section 496, "such claims would become the rule rather than the exception"].)

Second, reading Penal Code section 496 to apply in theft-related tort cases would effectively repeal the punitive damages statutes.  (*California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 945 [noting "strong presumption" against "implied repeal"].)  Until now, a plaintiff seeking greater than compensatory damages had to prove, by clear and convincing evidence, that the defendant was "guilty of oppression, fraud, or malice."  (Civ. Code, § 3294, subd. (a).)  If Penal Code section 496 applied to these torts, a plaintiff could obtain treble damages merely by proving the tort itself by a preponderance of the evidence.  (Evid. Code, §§ 500, 115 [preponderance of the evidence is the default burden in civil cases].)[11]

What is more, our Legislature has not shouted, stated, or even whispered anything about Penal Code section 496 effecting such a "significant change" to the universe of tort remedies.  Rather, the Legislature had a far more targeted goal in mind

---

[11]    Because Penal Code section 496, subdivision (c) authorizes an award of attorney fees along with treble damages, extending its reach beyond the context of stolen property would have a third significant effect:  It would authorize fee shifting in nearly every tort cause involving fraud, misrepresentation, or breach of fiduciary duty, thereby creating a gaping exception to the general rule against such fee shifting.  (§ 1021).

when it enacted Penal Code section 496's treble damages remedy—namely, "to dry up the market for stolen goods." (*Bell*, *supra*, 212 Cal.App.4th at p. 1047.) Penal Code section 496's focus on *stolen goods* is reflected in the statute's title, which specifies that it deals with "Receiving stolen property." (*People v. Hull* (1991) 1 Cal.4th 266, 272 ["""section headings""" "'are entitled to considerable weight'" "'"in determining legislative intent""'"], citation omitted.) It is reflected in the traditional understanding of the crime defined in Penal Code section 496, subdivision (a), which requires proof that "(1) the property was stolen; (2) the defendant knew the property was stolen; and, (3) the defendant had possession of the stolen property." (*People v. Land* (1994) 30 Cal.App.4th 220, 223.) And it is reflected in Penal Code section 496, subdivision (c)'s legislative history, which is replete with discussions about how best to achieve the "goal of eliminating markets for stolen property, in order to substantially reduce the incentive to hijack cargo from common carriers." (*Citizens of Humanity, LLC v. Costco Wholesale Corp.* (2009) 171 Cal.App.4th 1, 17-18, overruled on other grounds as stated in *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 337 (*Kwikset*).) Although the Legislature ultimately opted not to limit the treble damages remedy to actions against "public carriers," its focus never strayed from drying up the market for stolen goods. (*Ibid.*, italics omitted) Because imposing treble damages in cases alleging fraud, misrepresentation, breach of fiduciary duty and other torts outside the context of stolen property does nothing to "advance the legislative purpose to 'dry up the market for stolen goods,'" we cannot even infer any legislative intent to affect this significant change.

45

The Legislature's silence is even more deafening when contrasted with other statutes that speak with a much clearer voice in creating the extraordinary remedy of treble damages. (E.g., Bus. & Prof. Code, § 16750, subd. (a) [treble damages available for violations of the Cartwright Act setting state antitrust laws]; *id.*, § 17082 [treble damages available for violations of the Unfair Competition Law]; Civ. Code, §§ 52, subd. (a) & 54.3, subd. (a) [treble damages available for violations of the Unruh Civil Rights Act]; *id.*, § 1719, subd. (a)(2) [treble damages available to payee for passing checks with insufficient funds]; *id.*, § 3345 [treble damages available "in actions brought by, on behalf of, or for the benefit of senior citizens or disabled persons . . . to redress unfair or deceptive acts or practices or unfair methods of competition"]; Gov. Code, § 12651, subd. (b) [treble damages available for violations of the False Claims Act]; Lab. Code, § 230.8, subd. (d) [treble damages available for denying employees' wages "to engage in child-related activities" protected by statute]; see also 18 U.S.C. § 1964(c) [treble damages available under the federal Racketeer Influenced and Corrupt Organizations Act].)

Because we cannot presume that our Legislature intended to so significantly alter the universe of tort remedies without saying anything about its desire to do so, we conclude that Penal Code section 496's language sweeps more broadly than its intent and hold that it does not provide the remedy of treble damages for torts not involving stolen property. We recognize that *Switzer*, and to a lesser extent, *Bell*, came to the contrary conclusion based on their view that Penal Code section 496's *language* was controlling. *Switzer* took an additional step, noting that legislative intent can sometimes trump a statute's plain

46

language, but choosing to focus on whether extending treble damages to all tort cases involving "theft" was such an outlandish outcome as to be deemed "absurd." (*Switzer, supra*, 35 Cal.App.5th at pp. 129-131.) As explained above, we take the path *Switzer* chose not to take and conclude that Penal Code section 496's language diverges from the Legislature's intent and that its narrower intent is controlling.

Siry's final salvo is to assert that it properly alleged a violation of Penal Code section 496 in its operative complaint. That may be true, but it is irrelevant because, as we now hold, Penal Code section 496—no matter how well it is pled—does not provide the remedy of treble damages based on the underlying allegations in this case.

In light of the unavailability of treble damages under Penal Code section 496, Siry's election to receive treble damages over punitive damages is a nullity; in its place, Siry is entitled to receive the $1 million in punitive damages assessed against each Farkhondehpour and Neman.

### 2.    *Attorney fees*

As a general rule, California follows the so-called "American rule" when it comes to attorney fees: Parties in civil litigation bear their own unless a statute or contract provides otherwise. (§ 1021; *Eden Township Healthcare Dist. v. Eden Medical Center* (2013) 220 Cal.App.4th 418, 425.) The trial court awarded Siry attorney fees under two statutes—namely, Penal Code section 496, subdivision (c), and section 1029.8. The fee award under Penal Code section 496 was in error because, as we hold above, that statute does not reach the type of conduct involved in this case.

This leaves section 1029.8 as the sole basis for attorney fees. That statute empowers a trial court to award "all costs and attorney's fees" against "[a]ny unlicensed person who causes injury or damage to another person as a result of providing goods or performing services for which a license is required." (§ 1029.8, subd. (a).) The court found a fee award under section 1029.8 to be appropriate because defendants acted as (1) unlicensed construction contractors, and (2) unlicensed broker-dealers. We separately consider each basis for the award.

a.      *Did defendants act as unlicensed contractors involved in construction activity?*

California requires "person[s] engaged in the business or acting in the capacity of a contractor" to be licensed. (Bus. & Prof. Code, § 7031.) For these purposes, and as pertinent here, a "contractor" is "any person who [(1a)] undertakes to or [(1b)] offers to undertake to, or [(1c)] purports to have the capacity to undertake to, or [(1d)] submits a bid to, or [(1e)] does himself or herself or by or through others [(2)] construct, alter, repair, add to, subtract from, improve, move, wreck or demolish any building . . ." (*Id.*, § 7026.) Requiring contractors to be licensed "provide[s] minimal assurance that all persons offering such services in California have the requisite skill and character, understand applicable . . . laws and codes, and know the rudiments of administering a contracting business." (*Hydrotech Systems, Ltd. v. Oasis Waterpark* (1991) 52 Cal.3d 988, 995.)

As construed by the courts, a "contractor" is only a person or entity who (1) actually performs construction services (*Contractors Labor Pool, Inc. v. Westway Contractors* (1997) 53 Cal.App.4th 152, 165 (*Westway*); *WSS Industrial Construction, Inc. v. Great West Contractors, Inc.* (2008) 162 Cal.App.4th 581, 587-593 (*WSS Industrial*); (2) "supervise[s] the performance of

48

construction services" (*Westway*, at p. 165; *WSS Industrial*, at p. 593 ["overseeing" construction work]); or (3) agrees by contract to be "'solely responsible'" for construction services (*Vallejo Development Co v. Beck Development Co.* (1994) 24 Cal.App.4th 929, 935-936, 939-940 (*Vallejo Development*)).  In the last two scenarios, a license is required even if the construction work is actually performed by someone else.  (Bus. & Prof. Code, § 7026 [reaching work "by or through others"]; *Vallejo Development*, at p. 941.)  However, a license is not required if a person or entity merely coordinates construction services performed by others (*The Fifth Day, LLC v. Bolotin* (2009) 172 Cal.App.4th 939, 947-950), or supplies labor for those services (*Westway*, at pp. 164-165).

In its operative complaint, Siry alleged the following in support of its entitlement to attorney fees by virtue of defendants' status as unlicensed contractors:

> "Although the construction done at the 241 property was performed by a third party, companies controlled by the defendants, including Investment Consultants, received construction management fees even though none of the defendants or their companies had a contractor's license.  As a result, defendants deprived Siry of its share of the partnership funds based on defendants' payment of partnership funds (as construction management fees) to entities controlled by them.  By doing so, defendants obtained the benefits of construction work at Siry's expense because Siry had no ownership interest in the entities controlled by defendants.  In addition, without a license, defendants, by themselves and through others, engaged in, or managed, construction activities, thus meeting the definition of a contractor under Bus. & Prof. Code

49

§ 7026.  For example, defendant Saeed Farkhondehpour performed construction management activities without a license by supervising the work.  Finally, by entering into a construction contract with an unlicensed contractor and/or by making payments to an unlicensed contractor, defendants aided and abetted unlicensed construction."

These allegations do not entitle Siry to attorney fees under section 1029.8 for two reasons.

First, as to every defendant but Farkhondehpour, Siry has not sufficiently alleged that they qualify as "contractors" in the first place.  Siry's conclusory allegation that defendants "meet[] the definition of a contractor" is a "conclusion of fact or law" that we must disregard.  (*Evans*, *supra*, 38 Cal.4th at p. 6.)  And Siry's more specific allegations fare no better because they do not allege that these defendants actually performed any construction services, supervised any construction services, or agreed by contract to be solely responsible for construction services.  Without such allegations, these defendants are not themselves "contractors."  They also cannot be held liable for attorney fees under section 1029.8 because the statute imposes liability against those who *are* unlicensed contractors, not those who *use* unlicensed contractors.  (*Rony*, *supra*, 210 Cal.App.4th at p. 757 [noting that section 1029.8 "contains no language . . . extending its reach to those who 'use' the services of unlicensed persons"].)

Second, and as to *all* defendants, Siry has not alleged that it suffered "injury or damage . . . *as a result of*" defendants' "perform[ance of services] for which a license is required." (§ 1029.8, subd. (a), italics added.)  As set forth above, Siry's sole allegation in this regard is that it was harmed by "defendants' payment of partnership funds (as construction management fees)

50

to entities controlled by [defendants]." However, the harm occasioned by this diversion of partnership funds would have occurred—and, under defendants' theories for recovery, would have been improper—even if each defendant had a contractor's license. Where an "injury "'would have happened anyway, whether or not the defendant"'" engaged in tortious behavior, then that tort "'"was not a cause in fact, and of course cannot be the legal or responsible cause"'" of that injury. (*Grotheer v. Escape Adventures, Inc.* (2017) 14 Cal.App.5th 1283, 1303; *Toste v. CalPortland Construction* (2016) 245 Cal.App.4th 362, 370.) Because Siry failed to allege that defendants' *unlicensed status* is what caused its injury, Siry failed to show that its injury was "as a result of" that unlicensed status, as required by section 1029.8. (See *Kwikset*, *supra*, 51 Cal.4th at p. 326 ["'The phrase 'as a result of' in its plain and ordinary sense means 'caused by' and requires a showing of a causal connection or reliance on the alleged misrepresentation.' [Citation.]"].) Siry's sole rejoinder is to argue that defendants' deprivation of Siry's "share of partnership funds . . . based on their construction-related shenanigans . . . trigger[ed] attorney's fees under section 1029.8. End of story." This argument labors under the same misconception as Siry's complaint—namely, that awarding attorney fees under section 1029.8 requires no causal link between the lack of a license and harm to the plaintiff. Section 1029.8's plain language forecloses this argument.

           b.     *Did defendants act as unlicensed broker-dealers selling securities?*

California law prohibits any "broker-dealer" from "effect[ing] any transaction in, or induc[ing] or attempt[ing] to induce the purchase or sale of, any security . . . unless the broker-dealer" is licensed. (Corp. Code, § 25210.) A "broker-dealer" is

51

"any person engaged in the business of effecting transactions in securities in this state for the account of others or for [his] own account." (*Id.*, § 25004, subd. (a).) And a "security" is defined by reference to a long list of investment vehicles (*id.*, § 25019), although that list is meant to be "illustrative" rather than exhaustive (*People v. Graham* (1985) 163 Cal.App.3d 1159, 1164 (*Graham*)). Given this approach, "the 'critical question' . . . is whether [the] transaction [at issue] falls within the regulatory purpose of the law regardless of whether it involves an instrument [or vehicle] which comes within the literal language of the definition." (*People v. Figueroa* (1986) 41 Cal.3d 714, 735.) The purpose of this licensing law is "'to protect the public against the imposition of unsubstantial, unlawful and fraudulent stock and investment schemes and the securities based thereon.' [Citation.]" (*Id.* at p. 736.)

As construed by the courts, an investment vehicle constitutes a security if it satisfies one of two tests: (1) the "risk-capital test" first articulated in *Silver Hills Country Club v. Sobieski* (1961) 55 Cal.2d 811 (*Silver Hills*), or (2) the "federal test" first articulated in *SEC v. W.J. Howey Co.* (1946) 328 U.S. 293 (*Howey*). (See generally, *People v. Black* (2017) 8 Cal.App.5th 889, 900.)

In its operative complaint, Siry alleges the following in support of its entitlement to attorney fees by virtue of defendants' status as unlicensed broker-dealers selling securities:

> "The creation/sale of the limited partnership interest at issue here qualifies as a security (i.e., an investment contract) as defined by Corporations Code section 25019. [Siry] was damaged as a result of defendants' unlicensed activities in violation of Corporations Code section 25004 [governing broker

52

dealers]. Specifically, defendants sold securities to others (e.g., [Siry's] limited partnership interest) in the capacity of a broker-dealer without a license."

These allegations do not entitle Siry to attorney fees under section 1029.8 because Siry has not sufficiently alleged strict compliance with the prerequisites necessary for its partnership interest to qualify as a "security."

To begin, Siry's conclusory allegation that its "limited partnership interest . . . qualifies as a security" is a "'"conclusion of . . . law"'" entitled to no weight whatsoever. (*Evans*, *supra*, 38 Cal.4th at p. 6.) The same is true of its companion allegation that the interest qualifies as "an investment contract"—both because it is conclusory *and* because the term "investment contract" is "so broad as to give little more guidance than the term 'security'" (*Graham*, *supra*, 163 Cal.App.3d at p. 1165, fn. 4).

Although a limited partnership interest *can* constitute a "security" "under appropriate circumstances" (*Graham*, *supra*, 163 Cal.App.3d at p. 1166; *People v. Simon* (1995) 9 Cal.4th 493, 499), Siry has not alleged that those circumstances exist here because it has not alleged that its limited partnership interest satisfies *either* the risk-capital or federal tests.

A limited partnership interest qualifies as a "security" under the risk-capital test only if it involves "[(1)] an attempt by an issuer to raise funds for a business venture or enterprise; [(2)] an indiscriminate offering to the public at large where the persons solicited are selected at random; [(3)] a passive position on the part of the investor; and [(4)] the conduct of the enterprise by the issuer with other people's money." (*Silver Hills*, *supra*, 55 Cal.2d at p. 815.) Siry never alleged that it was solicited "at random"; to the contrary, Siry submitted declarations indicating

53

that it was solicited due to the long-time friendship between its principal and Farkhondehpour and Neman.

A limited partnership interest qualifies as a "security" under the federal test only if it "involves an investment of money in a common enterprise with profits to come solely from the efforts of others." (*Howey*, *supra*, 328 U.S. at p. 301.) Although the terms of the limited partnership agreement appended to the operative complaint indicate that the limited partners were to have no management or control over the limited partnership and that the general partner was to have "exclusive control," Siry repeatedly alleges in its operative complaint that these contractual limitations were "disregarded" and that Farkhondehpour and Neman, despite being limited partners, "control[led], dominate[d], manage[d] and operate[d]" the limited partnership. Because Siry's allegations that the limited partnership agreement was being ignored preclude reliance on that agreement in lieu of a well-pled allegation that Siry was merely a passive investor, Siry needed to affirmatively plead its passivity. But there is no such allegation in Siry's operative complaint, and its absence is fatal.

Siry's sole remaining contention is that two provisions in the limited partnership agreement otherwise suggest that the parties' limited partnership interests were securities. Siry points to (1) the general partner's power to refuse to consent to a limited partner's transfer of its partnership interest "if such transfer would constitute a violation of any rule, law, or securities regulation," and (2) the prohibition against a limited partner assigning its interest "if, in the opinion of counsel to the Partnership, such assignment may not be effectuated without registration under the Securities Act of 1933, as amended, or

would result in the violation of . . . federal or state securities laws."  Rather than constituting proof that the limited partners definitively viewed their interests as securities, these provisions reflect uncertainty on that question and a marked desire *not* to engage in transactions that would subject them to securities laws—an odd result if the parties already viewed the limited partnership interest as a security.

        c.     *Are the attorney fees awards invalid for other reasons?*

In light of our conclusion that there is no statutory basis for the court's award of attorney fees, we have no occasion to consider defendants' remaining arguments that the trial court also erred in (1) awarding fees for litigation prior to the settlement of the initial lawsuit between the parties, (2) awarding fees for litigation prior to the filing of the third amended complaint when Siry first sought attorney fees in this case, or (3) awarding fees when Siry never gave notice of a maximum amount of attorney fees.

*     *     *

Where, as here, "a trial court erroneously award[ed] [one type of damages,] a reviewing court may, instead of reversing the entire judgment, make an order of modification striking that portion relating to [the erroneously awarded] damages and affirm the judgment as so modified."  (*Crogan v. Metz* (1956) 47 Cal.2d 398, 405; accord, *Mega RV Corp. v. HWH Corp.* (2014) 225 Cal.App.4th 1318, 1344; cf. *Van Sickle v. Gilbert* (2011) 196 Cal.App.4th 1495, 1521-1522 ["when a judgment is vacated on the ground [that] the damages awarded exceeded those pled," the reviewing court ordinarily affirms and modifies the judgment to reduce the damages, but may allow the trial court to decide whether to vacate the default to allow further amendment].)

## DISPOSITION

The amended judgment is affirmed as modified. We order that the amended judgment be modified to (1) strike the $1,912,974 treble damages award in its entirety and substitute in its place the $2 million punitive damages award, with Farkhondehpour (jointly and severally as an individual and as a trustee) and Neman (jointly and severally as an individual and as a trustee) severally liable for $1 million each, and (2) strike the $4,010,008.97 attorney fees award in its entirety. The parties are to bear their own costs on appeal.

**CERTIFIED FOR PUBLICATION**.

_____, J.
HOFFSTADT

We concur:

_____, P.J.
LUI

_____, J.
CHAVEZ

56